# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY M. OLESZKO )
)
Plaintiff, )
)
v. )  **Case No. 04 C 2616**
)  **Magistrate Judge Nan R. Nolan**
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This a social security disability case. Cross-motions for summary judgment are pending. The Court has carefully reviewed the more than 500 page record. For the reasons that follow, Plaintiff's Motion for Summary Judgment or Remand [19-1] is denied, and the Commissioner's Motion for Summary Judgment [21-1] is granted.

## BACKGROUND

Plaintiff Anthony Oleszko is a high school graduate. He was 54 years old when his insured status expired on June 30, 2001. He worked for United Postal Service (UPS) between 1969 and July 3, 1995. Oleszko first worked as a package driver for UPS. In 1978, he became a feeder driver for UPS, which required lifting up to 70 pounds. Oleszko's application for disability insurance benefits alleged disability since July 3, 1995, due to a left wrist injury sustained from a fall from a UPS tractor trailer as well as back pain from an injury in 1992-1993. Subsequent to filing his application, Oleszko sustained an injury to his right wrist in April 2000. Oleszko also reported pain in his calves.

The ALJ applied the five-step analysis of 20 C.F.R. § 404.1520(a)(4)(i)-(v) and found that Oleszko had not engaged in substantial gainful activity since the alleged onset of disability (step

one); that his status post fracture of the left wrist was a severe impairment (step two); but that it did not qualify as a listed impairment (step three). The ALJ determined that Oleszko retained the residual functional capacity (RFC) to perform a full range of light work.[1] The ALJ also concluded that Oleszko was unable to perform his past relevant work (step four); but that under the grids, he was not disabled (step five).

## DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski

_____

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Oleszko's claim at Step 5, finding that Oleszko retains the residual functional capacity to perform a full range of light work. Oleszko raises four main challenges to the ALJ's decision: (1) the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to comply with SSR 96-8p; (2) the ALJ failed to comply with SSR 96-7p and improperly discredited Oleszko's complaints of pain; (3) the ALJ erred at Step 5 because he did not consult a vocational expert (VE) and improperly relied on the grids in reaching his conclusion; and (4) the ALJ violated the regulations by failing to perform a borderline age analysis. None of Oleszko's arguments warrant reversal or remand.

1.    RFC Determination

Oleszko contends that the ALJ's RFC finding is erroneous because he failed to provide a function-by-function assessment of Oleszko's vocational abilities. Oleszko relies on the following paragraphs of SSR 96-8p:

> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work . . . .

In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Oleszko argues that the ALJ failed to provide the logic he used in reaching his RFC determination.

Social Security Ruling 96-8p states: "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." "SSR 96-8p requires an ALJ to individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC." Delgado v. Commissioner of Social Security, 2002 WL 343402, at *4 (6th Cir. March 4, 2002). However, there is a distinction between what an ALJ must consider and what an ALJ must articulate in the opinion. Lawson v. Apfel, 2000 WL 683256, *3 (S.D. Ind. May 25, 2000); Delgado, 2002 WL 343402, at *5 (noting Third Circuit opinion which "distinguished between what an ALJ must consider and what an ALJ must discuss in a written opinion."). Social Security Ruling 96-8p "does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities." Lawson, 2000 WL 683256 at *4.

Here, the ALJ made the required findings, and his RFC determination is supported by substantial evidence. The ALJ carefully reviewed the evidence in the record when he assessed

Oleszko's residual functional capacity and explained how he arrived at his conclusions. The ALJ began by noting that Oleszko was treated for complaints of low back pain in 1989 and 1990. (R. 19). The ALJ reviewed the results of an MRI of the lumbar spine on December 9, 1989. Id. The MRI revealed disc degeneration in the L4-5 and L-5-S-1 discs but no herniated disc and no spinal stenosis. (R. 19, 340). The ALJ also considered an examining physician's note dated February 6, 1990 which indicated that Oleszko had complaints of pain continuing in the buttocks and down the leg area. (R. 19, 329). The ALJ noted that the physician concluded that he found no neurological deficits. Id.

The ALJ considered Oleszko's complaints of cervical spine-related pain. (R. 19). The ALJ noted that beginning in 1993, Oleszko was treated for complaints of neck and shoulder pain. Id. The ALJ considered the results of an MRI of the cervical spine on January 2, 1993. (R. 19). The MRI indicated minimal bulge of the C6-7 disc without neural impingement (R. 129). The ALJ also considered the results of an MRI of the thoracic spine on January 27, 1993, which was normal. (R. 19, 121). The ALJ reviewed the results of myelograms of the cervical and lumbar spine from March 15, 1993. (R. 20). The lumbar myelogram was normal with no evidence of spinal stenosis. (R. 20, 154). The cervical myelogram was normal except for very mild midline bulge at the C6-7 level with no evidence of disc herniation. Id.

The ALJ also discussed the August 10, 1993 report of Dr. Robert A. Beatty. (R. 20, 359). Dr. Beatty's report states that he saw Oleszko on March 11, 1993 and that he brought with him an MRI which showed a central C6-7 disc herniation. (R. 359). Dr. Beatty concluded that it was his impression that Oleszko has a cervical disc herniation which is producing his persistent neck and arm pain. Id. Dr. Beatty recommended that Oleszko undergo an anterior cervical fusion of the C6-7 disc. Id.

The ALJ stated that Oleszko received physical therapy for cervical spine related pain at the Newsome Rehabilitation Clinic between April and July of 1993. (R. 20, 360-68). The ALJ noted that on April 28, 1993, Oleszko was able to lift 30 pounds, times 20 repetitions, which is what he frequently encountered during his work day. (R. 20, 365). On July 13, 1995, Oleszko reported to the physical therapist that his pain had decreased to a 3-4 out of 10. (R. 361). The physical therapist concluded that Oleszko's "complaints are slowly improving and [his] ability to exercise is increasing." Id. The physical therapist concluded that Oleszko would "best benefit from continued exercise on an independent home exercise program." Id. On July 15, 1993, the physical therapist reported that she informed Oleszko that she and Dr. Beatty recommended an independent exercise program at a local gym. (R. 360). The physical therapist instructed Oleszko to call her after two weeks if he had an increase in pain and to be re-evaluated in physical therapy in one month to assess any change in status. Id. The ALJ noted that following this treatment, Oleszko returned to work and did not have any significant complaint or treatment for problems relating to his cervical spine until 2001. (R. 20.).

The ALJ reviewed the medical records from Oleszko's treatment for complaints of cervical back and neck pain at Provena Saint Joseph Medical Center during July 2001. (R.20, 407-418). On July 16, 2001, Oleszko was started on a home exercise program (R. 416). On July 31, 2001, the physical therapist reported that Oleszko had met his short-term goals of improved forward bending and left side bending for cervical spine. (R. 418). As the ALJ noted, Oleszko also had a 90% improvement in range of motion and good strength of the upper extremities. (R. 417-18). The ALJ further noted that despite the good range of motion and good strength, Oleszko continued to have significant complaints of pain. (R. 20, 418).

The ALJ next noted that Oleszko underwent surgery on his left wrist on December 13, 1995. (R. 21). The ALJ assessed Oleszko's ability to lift. The ALJ noted that Dr. Bednar's treatment notes indicate that Oleszko was able to lift 26 pounds on March 1, 1996 and lift and carry in the 30 to 33 pound range on March 29, 1996. (R. 21, 184, 185). On March 29, 1996, Dr. Bednar stated that Oleszko could return to work with a 35 pound weight restriction. (R. 184).[2] The ALJ reviewed the therapy notes from June 21, 1996. (R. 21). As of that date, Oleszko had a lifting capacity with the left hand of 35 pounds and a lifting capacity of 50 pounds with the right hand. (R. 21, 22, 156).[3] His bilateral lifting capacity was 60 pounds. Id. On December 17, 1996, Dr. Bednar stated that Oleszko was having less pain on the ulnar side of the left wrist than he had in the past. (R. 21, 179). Dr. Bednar further noted that Oleszko had reached the point of maximum medical improvement, and Oleszko was discharged. (R. 179). Dr. Bednar stated he would see Oleszko on an as needed basis. Id.

The ALJ also considered the physical therapy Oleszko received at Rush-Presbyterian St. Luke's Occupational Health Centers in 1995 and 1996. (R. 21; 271-276; 278-280; 285-289; 292-

---

[2] Oleszko claims that Dr. Bednar's March 1 and March 29, 1996 notes are "internally contradictory" because "Dr. Bednar's ultimate restriction of 35 lbs. is higher than that even he thought Oleszko could manage (30-33 lbs.)" and "is also 9 pounds heavier than a few weeks earlier." Pl's Reply at 9. The Court finds Oleszko's argument unpersuasive because all of these findings by Dr. Bednar support the ALJ's conclusion that Oleszko retained the ability to lift up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

[3] Oleszko spends a substantial portion of his reply brief arguing generally that functional capacity evaluations are not reliable. The Court rejects Oleszko's argument for two reasons. First, Oleszko did not challenge the reliability of the Midwest Hand Care physical therapist's reports until his reply brief. It is too late to make an argument for the first time in a reply brief because the Commissioner is denied an opportunity to respond. Baloun v. Williams, 2002 WL 31426647 at *9 (N.D. Ill. Oct. 25, 200) (Nolan, M.J.). Moreover, Oleszko has not specifically shown that the physical therapist's reports, daily progress reports, and record of change in this case (R. 156-173) are unreliable.

294; 296-328). The ALJ noted that the final report from Rush-Presbyterian St. Luke's Occupational Health Centers was March 27, 1996. (R. R. 21, 271, 317). In the March 27, 1996 report, Dr. Lewis stated, among other things, that Oleszko had been told that he had plateaued. (R. 271). Dr. Lewis recommended that Oleszko "remain on right hand work if available, and that he return to see [Dr. Lewis] in six weeks." Id. Oleszko did not return to see Dr. Lewis. (R. 317). The ALJ noted that Oleszko did not receive any other medical treatment for his left wrist after June 1996. (R. 21, 156). The ALJ also noted that "there is no indication of any significant continuation of complaints with respect to problems with the left wrist after that date." (R. 21).[4]

The ALJ also reviewed the medical evidence regarding the fracture of Oleszko's right wrist on April 16, 2000. (R. 21). The ALJ noted that on May 30, 2000, Dr. Ortinau removed Oleszko's cast. (R. 21, 246). X-rays taken that day revealed "a healed fracture with a little bit of shortening, just a few millimeters, but acceptable radial inclination and acceptable volar tilt." (R. 246). As the ALJ noted, Oleszko was discharged from Dr. Ortinau's care. (R. 21, 246). Oleszko was given some home exercises to increase range of motion and strengthening and a prescription for physical therapy should he decide to use it. (R. 246). The ALJ also noted that there was no medical finding that Oleszko sustained any significant loss of use with respect to his right hand. (R. 22). The ALJ further considered the medical records from the Will-Grundy Medical Clinic in 2001. (R. 21, 397-405).

_____

[4]Although the ALJ could have discussed the contents of the March 27, 1996 final report, his listed reasons for finding that Oleszko retained the RFC to perform the lifting requirements of light work–the Midwest Hand Care report from June 21, 1996 (R. 156), Dr. Bednar's progress notes from March 1996 (R. 184, 185), Dr. Bednar's final report dated December 17, 1996 (R. 179), the failure to obtain medical treatment for his left wrist after March 1996 and the lack of complaints with respect to wrist problems after that date–allow the Court to adequately review his conclusions and provide substantial evidence for his RFC determination. An ALJ must at least build "an accurate and logical bridge from the evidence to [his] conclusion," and the ALJ did so here. Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001).

During these visits, Oleszko complained of pain and tenderness in his calves and generalized complaints of pain all over his body. Id.

The ALJ also assessed Oleszko's ability to sit, walk, and grip. (R. 22-23). The only evidence regarding Oleszko's ability to sit, walk, and grip is his own testimony that sitting causes him lower back pain, that he cannot walk more than 5 blocks, and that he cannot grip with three fingers on his right hand. (R. 22-23; 494; 495; 501). The ALJ found Oleszko's testimony not fully credible. (R. 23). The ALJ need not include a function-by-function discussion of exertional limitations which the ALJ found not credible. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (holding "[p]reparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."). Moreover, the ALJ need not discuss capacities for which no limitation is alleged. Delgado, 2002 WL 343402 at *4-5.

Finally, the ALJ based his assessment of Oleszko's RFC on the state examiner's function-by-function analysis of his exertional limitations.[5] The ALJ stated that the "report from the functional capacity evaluations that the claimant has undergone have indicated that he has, at least, the ability to perform a full range of light work." (R. 23). The ALJ's consideration of the state agency physician's functional assessment is further evidence that the ALJ performed the function-by-function analysis required by SSR 96-8p. The state agency physician concluded that Oleszko could

---

[5] Oleszko claims that it is unclear whether the ALJ based his RFC determination on the PRFC assessment form. The ALJ stated: "The report from the functional capacity evaluations that the claimant has undergone have indicated that he has, at least, the ability to perform a full range of light work." (R. 23). Although the ALJ could have been clearer, the Court has carefully reviewed the record and concludes that the only reasonable inference is that the ALJ was referring to the PRFC assessment. Oleszko also points out that the DDS employees did not explain on page 257 of the record how the evidence support their conclusions. Pl's Memo. at 15. The DDS employees' failure to complete the bottom of page 257 is harmless because that explanation was provided at page 263 under "additional comments."

occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total about 6 hours in an 8-hour workday, and push and/or pull unlimited. (R. 257). The state agency physician found no postural, manipulative, visual, communicative, or environmental limitations. (R. 258-60).

Oleszko argues that the ALJ failed to consider the combination of his impairments in making his RFC determination. Pl's Memo. at 15. As Oleszko suggests, the ALJ must consider all of the claimant's impairments together, including impairments that are not severe taken by themselves. Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003). As reviewed above, the ALJ thoroughly accounted for all of Oleszko's impairments, including his back impairments, and adequately explained why he concluded that Oleszko was not disabled.[6] Oleszko's implication in his reply brief that the ALJ did not assess his back impairments is an inaccurate characterization of the record. The ALJ noted that objective testing has revealed "some degenerative changes and some disc bulging," but that the record indicates that Oleszko does not have any significant neurological deficits relating to problems with either his cervical or lumbar spine. (R. 20). The ALJ further noted that no findings of any significant radiculapathy have been made or noted in the record. Id. Moreover, in his review of the medical evidence, the ALJ noted that the myelogram of the lumbar spine in March 1993 was normal with no evidence of spinal stenosis at any level and the myelogram of the cervical spine revealed only "very mild" midline bulge at C6-7 and disc herniation at any level.

---

[6] In his argument regarding the ALJ's RFC determination, Oleszko appears to challenge the ALJ's failure to identify his back impairments as severe at step two. Pl's Memo. at 15. The medical records Oleszko cites do not identify any limitations due to his back condition that significantly limit his ability to do basic work activities and thus do not contradict the ALJ's finding that his back condition is not severe. 20 C.F.R. § 404.1512(a). Even if the ALJ improperly found Oleszko's back impairments non-severe at step two, the error was harmless because he continued with the sequential evaluation and considered Oleszko's impairments in combination.

(R. 20, 154).

In his reply brief, Oleszko claims that this case is similar to <u>Golembiewski v. Barnhart</u>, 322

F.3d 912, 916-17 (7th Cir. 2003), in which the Seventh Circuit reversed an ALJ's finding of no

disability because, among other reasons, the ALJ mischaracterized the medical evidence. In

<u>Golembiewski</u>, the ALJ remarked that a MRI showed only "some disc degenerations" with "no

herniations" when in fact an MRI showed disc degeneration with probable "lumbosacral herniation."

<u>Golembiewski</u> is not controlling here. Any claim that the ALJ mischaracterized the record regarding

Oleszko's back condition and his citation to <u>Golembiewski</u> should have been made in his opening

brief. Again, it is too late to raise arguments for the first time in a reply brief.

Moreover, the ALJ here did not claim that the record revealed an absence of disc herniation.

The ALJ noted that Dr. Beatty made a diagnosis of possible disc herniation at the C6-7 vertebra

level. (R. 20). Later in his decision, the ALJ stated that "[t]here has never been a definitive

diagnosis that the claimant has had a herniated disc." <u>Id</u>. The ALJ's finding of a lack of a definitive

diagnosis of disc herniation is reasonable given the record. Dr. Beatty stated in his August 10, 1993

letter that his "impression is that he has a cervical disc herniation which is producing his persistent

neck and arm pain." (R. 359). Dr. Beatty's finding appears to be based on an unidentified MRI scan

that Oleszko brought with him to see Dr. Beatty on March 11, 1993. <u>Id</u>. A MRI of the cervical spine

dated January 2, 1993 found "minimal bulge of the C6-7 disc without neural impingement." (R.

129). In his March 15, 1993 report, Dr. Beatty characterized a cervical MRI scan as showing a

"questionable C6-7 bulge." (R. 141). Dr. Beatty ordered lumbar and cervical myelograms to "rule

out herniated cervical disc and herniated lumbar disc." (R. 142). The March 15, 1993 lumbar

myelogram was normal and the cervical myelogram was normal except for "very mild midline bugle

at the C6-7 level." (R. 154). Despite Dr. Beatty's impression, no evidence of disc herniation at any

-11-

level was found on the cervical myelogram. Id.

Oleszko also argues that the ALJ's RFC finding is not supported by substantial evidence to the extent the ALJ relied on the PRFC assessment form from July 2000. Oleszko asserts that the PRFC does not constitute substantial evidence because it only accounted for his wrist impairments and did not consider his back condition. The ALJ properly relied on the PRFC in making his RFC finding. There is no evidence that the DDS employees did not consider the entire record in completing the PRFC assessment form. In fact, the first page of the form directs the employees to "base your conclusions on all evidence in [the] file," "consider[] and respond[] to any alleged limitations imposed by symptoms," and "respond to all allegations of physical limitations or factors which can cause physical limitations." (R. 256). The problem with Oleszko's argument is that it fails to account for the fact that he did not have any significant complaint or treatment for problems relating to his back between July 1993 and July 2001, and he returned to work in 1993 and worked until July 1995. Given the lack of significant medical evidence regarding Oleszko's back condition after he returned to work and the PRFC in July 2000, the Court is unwilling to presume that the DDS employees failed to consider Oleszko's back condition without any explicit evidence to that effect. Furthermore, even if the PRFC only considered Oleszko's wrist impairments, the PRFC was not the sole basis for the ALJ's RFC determination. The ALJ's RFC assessment considered Oleszko's back impairments. (R. 19-20, 22). The PRFC was only one part of the ALJ's RFC assessment and the remainder of his assessment is supported by substantial evidence.[7]

---

[7] The Court also rejects any implicit argument that the ALJ had a duty to obtain an updated PRFC assessment. The ALJ had a duty to fully and fairly develop the record, and he fulfilled that obligation. Smith v. Apfel, 231 F.3d 433, 437 (7th Cir. 2000). The Seventh Circuit has held that courts "must respect the authority of administrative officials to decide how much is enough" because "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." Kendrick v. Shalala, 998

2.    Credibility Determination

Oleszko argues that the ALJ failed to comply with the criteria for assessing credibility set

forth in SSR 96-7p and improperly discredited Oleszko's complaints of pain. The ALJ found

Oleszko's allegations of pain and functional limitations "not fully credible." The ALJ explained:

> The objective medical evidence and clinical findings, including the reports, treatment
> notes and opinions of the claimant's own treating physicians, have not disclosed a
> disabling condition which would preclude the claimant from performing a full range
> of light work. The report from the functional capacity evaluations that the claimant
> has undergone have indicated that he has, at least, the ability to perform a full range
> of light work. The claimant's testimony that he did not receive any significant
> treatment from June, 1996 until he again sought treatment in June, 2001 for pain in
> his upper extremities, also indicates that the clamant is not experiencing severe pain
> or functional limitations. His testimony that he does not take any pain medications
> and that he did not have any prescriptions for pain until at least July, 2001 when he
> received Ibuprofen, [is] also inconsistent with the claimant's testimony that he
> experiences severe pain. The claimant's testimony, overall, was not supported by the
> preponderance of evidence in this case.

(R. 23).[8]

_____

F.3d 455, 456-57 and 458 (7th Cir. 1993). Moreover, the ALJ properly relied on PRFC even though
it was over a year and a half old at the time of the ALJ's decision. In Luna v. Shalala, 22 F.3d 687,
693 (7th Cir. 1994), the Seventh Circuit rejected the contention that the ALJ is required to "update
objective medical evidence to the time of [the] hearing." Although the Commissioner has the burden
of proving Oleszko's capacity to perform a full range of light work, it is Oleszko's duty "to bring to
the ALJ's attention everything that shows that he is disabled." Id. "This means that [Oleszko] must
furnish medical and other evidence that the ALJ can use to reach conclusions about his medical
impairment and its effect on his ability to work on a sustained basis." Id.

[8] The ALJ mischaracterized the record when he stated that Oleszko testified that he did not
take pain medications. Oleszko testified that he took Ibuprofen for pain. (R. 503). It is not clear
from Oleszko's testimony whether he was referring to his prescription for Ibuprofen which he first
received in July 2001 or over the counter Ibuprofen. Either way, the error was harmless. If Oleszko
was referring to his prescription Ibuprofen in his testimony, that was explicitly factored into the
ALJ's credibility determination. (R. 23). If Oleszko was testifying that he took over the counter
Ibuprofen to manage his pain, that fact would not demonstrate disabling pain and would not affect
the outcome of this case. Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (stating "[s]o the
administrative law judge's opinion is vulnerable. But that is nothing new. No principle of
administrative law or common sense requires us to remand a case in quest of the perfect opinion
unless there is reason to believe that remand might lead to a different result.").

Social Security Ruling 96-7p states that ALJs must provide "specific reasons" for a credibility finding. ALJs must also evaluate the credibility of the claimant's testimony about his symptoms in light of seven factors: (1) daily activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other factors concerning functional limitations. SSR 96-7p. An ALJ's credibility determination is entitled to "special deference" and will be reversed only if it is "patently wrong." Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ provided sufficient support for his finding that Oleszko was not fully credible regarding his complaints of pain. Contrary to Oleszko's assertion, the ALJ did not discredit his testimony as to his subjective symptoms merely because they were unsupported by the objective medical evidence. The ALJ noted that the medical findings were inconsistent with Oleszko's description of the severity of his pain. (R. 23). As the ALJ stated, none of the physicians concluded that Oleszko has limitations which preclude him from performing a full range of light work. Id. The ALJ considered the longitudinal medical record and observed that Oleszko did not receive any significant treatment between June 1996 and June 2001 (obviously excluding treatment for the fracture of his right wrist in 2000). (R. 23).[9] The ALJ also noted Oleszko's testimony that he did not take any prescription pain medication until July 2001 (excluding Vicodin when he broke his right wrist) when he received Ibuprofen. (R. 23, 505). Oleszko testified that between 1996 and the time he broke his right wrist in May 2000, he took only Tylenol and aspirin to manage his pain. (R. 505).

---

[9] Oleszko's suggestion that by pointing out the lack of medical treatment between 1996 and 1999, the ALJ failed to consider the treatment he received in 2000 is without merit. The ALJ carefully considered the medical evidence from 2000 and 2001. (R. 20, 21).

-14-

Oleszko's reliance on over the counter medications and use of Ibuprofen (a non-steroidal anti-inflammatory) to manage his pain supports the ALJ's credibility findings. See Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (evidence that claimant "relied for pain control on over-the-counter analgesics" supports conclusion that pain is not disabling.); Powers v. Apfel, 207 F.3d 431, 435-36 (7th Cir. 2000) (reliance on drugs not intended to treat severe pain suggests claimant may be exaggerating condition). Moreover, Oleszko's reported activities of daily living do not support his claim that he is disabled. In May 2000, he reported that he lives alone, can cook his own meals, can bath and dress himself, leaves his home five days a week to visit family and friends and/or do errands, and can drive a car. (R. 85-86).

Oleszko claims that the ALJ's reasons for not finding him not fully credible are not supported by substantial evidence or are factually incorrect. With regard to his back complaints, Oleszko faults the ALJ for failing to mention a December 1, 1992 MRI which found:

> Slight progression of disc bulges at the L 3-4 and L-4 levels compromise the adjacent left neural foraina at these levels and potentially impinging the left L-3 and L-4 nerve roots (though these are symmetric in size bilaterally). There is generalized bulge of the L-5-S-1 disc with a new tiny left central herination that appears to abutt the left S-1 nerve root within the thecal sac.

(R. 134). The ALJ did not err by failing to mention the 1992 MRI of the lumbar spine. The ALJ need not provide a written evaluation of each piece of evidence in the record. Rather, the ALJ must minimally articulate his analysis of the evidence so that this Court can follow his reasoning. Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ provided an adequate explanation for his finding that the objective medical evidence did not support Oleszko's claim that his pain and functional limitations prevented him from performing the full range of light work.

Moreover, the ALJ analyzed more recent evidence than the 1992 MRI with respect to the condition of Oleszko's back. For example, the ALJ discussed the March 15, 1993 myelograms of

the cervical and lumbar spine. (R. 20, 154). The myelogram of the lumbar spine revealed normal findings with no evidence of any stenosis and the myelogram of the cervical spine revealed very mild disc bulging at C6-7 with no evidence of disc herniation at any level. Id. The ALJ also noted a reported dated August 10, 1993 from a treating neurosurgeon, Dr. Beatty, which stated that he examined Oleszko on March 11, 1993. (R. 20, 359). In that report, Dr. Beatty diagnosed cervical disc herniation and recommended anterior cervical fusion of the C6-7. (R. 359). Oleszko did not undergo back surgery. The ALJ analyzed the physical therapy Oleszko received thereafter at the Newsome Rehabilitation Center for several months beginning in April 1993. (R. 20, 360-68). The ALJ noted that on April 28, 1993, Oleszko was able to lift 30 pounds. (R. 20, 365). The ALJ further noted that following the 1993 treatment for his back, there is no evidence relating to any significant complaint or treatment for problems relating to the cervical spine until 2001. (R. 20). Moreover, the ALJ noted that Oleszko returned to work in 1993 and worked through 1994 until his alleged disability of July 3, 1995. Id. The ALJ discussed an extensive amount of evidence and his conclusion was supported by substantial evidence.

Oleszko correctly points out that he ALJ did not mention that Oleszko took Elavil, Naprosyn, and Vioxx for pain relief in mid 2001, but his failure to do so is not fatal. See Pl's Memo. at 18 (citing R. 398-400). As discussed before, the ALJ is not required to discuss every piece of evidence. Moreover, Oleszko's limited use of Elavil, Naprosyn, and Vioxx in mid 2001 does not undermine the ALJ's finding that Oleszko's claimed pain and functional limitations are not fully credible. At the September 4, 2001 hearing, the ALJ asked Oleszko about his current medications. (R. 502). Oleszko explained that he had been prescribed Elavil to relax him and relieve the pain in his calves

at night.[10] (R. 502-03). He testified that Elavil made him feel "flaky," he report that feeling to his physician's office, and was told to discontinue its use. (R. 398, 503). He further testified that he took Elavil for a total of three or four days. (R. 503.) The record is not clear on how long Oleszko took Naprosyn, but Naprosyn is a mild painkiller. Kasarsky v. Barnhart, 335 F.3d 539, 541 (7th Cir. 2003).[11] Oleszko also fails to mention that he had only one prescription for Vioxx for 15 days beginning on June 21, 2001. (R. 404, 405). On July 5, 2001, Oleszko reported that the pain in his neck and chest had improved with the use of Vioxx. (R. 399). Finally, the ALJ did note in his decision that Oleszko received a prescription for Ibuprofen in July 2001. (R. 23, 404, 405). He received one refill on August 13, 2001 and reported on August 31, 2001 that Ibuprofen "makes him feel better." (R. 398, 404).

Oleszko cites Dr. Bednar's letter dated December 17, 1996 as evidence that the ALJ's credibility determination is not supported by substantial evidence. Pl's Memo. at 18. Oleszko points out that although his left wrist reached maximum improvement, he still had pain. (R. 179). Dr. Bednar's December 17, 1996 letter does not establish that the ALJ's credibility determination was erroneous. In that letter, Dr. Bednar concluded that Oleszko was at a point of maximum medical improvement. Id. He also stated that Oleszko reported "having less pain over the ulnar side of the wrist than he has had in the past." Id. Oleszko reported experiencing pain over the carpometacarpal joint of the middle finger. Dr. Bednar diagnosed small carpal boss but recommended no further

---

[10] Elavil is an "anti-depressant agent with mild tranquillizing properties used in the treatment of mental depression and sleeping disorders." Coil v. Barnhart, 2003 WL 22118943, at * 4 n.12 (N.D. Ill. Sept. 12, 2003) (citing Stedman's Medical Dictionary 61 (26th ed. 1995)).

[11] Oleszko cites a Will-Grundy Medical Clinic record dated June 21, 2001 which indicates that he reported Naprosyn as a current medication on that date. (R. 400). In a Recent Medications form submitted by his counsel on August 30, 2001, Oleszko did not report then taking Naprosyn. (R. 101).

therapy for the carpal boss at that time. Id.

Oleszko also appears to argue that the ALJ improperly rejected his explanation for his lack of medical treatment between 1997 and 1999. Oleszko testified that between 1997 and 1999, he did not have medical insurance and just "had to go through the pain." (R. 487). Under SSR 96-7p, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Inability to afford treatment and inability to access free or low-cost medical services "may provide insight into the individual's credibility." SSR 96-7p.

In rejecting Oleszko's testimony regarding the severity of his pain and functional limitations, the ALJ relied, in part, on his lack of any significant treatment from June 1996 to June 2001. (R. 23). Although the ALJ did not specifically so state, it is implicit in the ALJ's determination that he must have rejected Oleszko's lack of insurance explanation for his infrequent medical visits. The ALJ was free to reject Oleszko's explanation for his lack of medical treatment between 1997 and 1999. Social Security Ruling 96-7p requires the ALJ to consider whether the inability to afford treatment or lack of access to free or low-cost medical services may be a good reason for failing to pursue treatment, but it does not require the ALJ to accept Oleszko's testimony about his infrequent medical treatment. SSR 96-7p specifically states, "[i]n making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible."

The ALJ's implicit rejection of Oleszko's reason for failing to seek medical treatment between 1997 and 1999 is supported by other evidence in the record which indicates that Oleszko did not want or need treatment during those years. Although Oleszko testified that he did not seek medical treatment between 1997 and 1999 because he did not have medical insurance, his testimony also suggests that he did not need to seek medical treatment for pain:

Q. What about 1999? Any treatment for wrist or otherwise?

A. No. I haven't been – you know, like I said, I haven't had the insurance and I haven't gone back to the doctor's. *And then this year I started really hurting again. And I went back –*

(R. 487) (emphasis added). Oleszko also testified at the September 4, 2001 hearing that he had no medical insurance at the time of the hearing but was able to receive medical treatment at the Will-Grundy Medical Clinic. (R. 480). No explanation was provided for why he could not have sought treatment at the Will-Grundy Medical Clinic between 1997 and 1999. Moreover, the record contains thirty-six pages of medical records concerning Oleszko's treatment at the Hines VA during the period April 2002 through November 2002, which indicate that he is a "NSC Veteran." (R. 438-74). No explanation exists in the record regarding whether Oleszko was eligible for medical care through the Veterans Administration during the 1997 through 1999 period. Finally, Oleszko has not explained why he could not have afforded medical treatment in the later half of 1998 and 1999 in light of his worker's compensation settlement in June 1998 for more than $150,000. (R. 67-68).

3.     The Grids

Oleszko claims that the ALJ erred in using the grids without relying on the testimony of a VE. The ALJ found that the grids directed a finding of "not disabled" based upon Oleszko's residual functional capacity, age, education, and work experience. "When a claimant for disability benefits cannot be found disabled based upon medical considerations alone, the Social Security

-19-

Administration has established the grids in order to assess a claimant's ability to engage in substantial gainful activity." Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir. 1993). An ALJ may not use the grids when a claimant has a nonexertional limitation that "might substantially reduce a range of work an individual can perform." Zurawski v. Halter, 245 F.3d 881, 889 (7th Cir. 2001); Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994). An ALJ may rely on the grids if he finds the alleged nonexertional impairments not to be credible, or if there is substantial evidence that the limitations in question do not significantly diminish the claimant's ability to work. Luna, 22 F.3d at 691-92. Oleszko contends that he has three nonexertional limitations precluding use of the grids: (1) manual dexterity limitations; (2) difficulty sitting for long periods of time due to back pain, and (3) pain in his calves.

Oleszko contends that Social Security Rulings 83-10, 83-12, 83-14, and 83-15 mandate vocational expert testimony in his case. According to SSR 83-15, "nonexertional limitations can affect the abilities to reach, to seize, hold, grasp, or turn an object (handle) . . . ." SSR 83-14 explains:

> Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers. Rather, they require gross use of the hands to grasp, hold, and turn objects. Any limitation on these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work.

SSR 83-14; see also SSR 83-10 (stating light work jobs "require the use of arms and hands to grasp and to hold and turn objects . . . .). "Where the extent of the erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource." SSR 83-12.

In this case, Oleszko testified that he experiences a burning sensation in both wrists and he cannot grip with three fingers in his right hand. (R. 495). He also testified that he was only able to

lift a gallon of milk for a second or two. (R. 502). With respect to his ability to sit, Oleszko testified

that he can only sit a short time before his lower back starts hurting and can only walk five blocks

because of back and leg pain. (R. 501-02). The ALJ found that Oleszko's testimony with respect

to his pain and functional limitation was not fully credible, citing the objective medical evidence and

clinical findings, the residual functional capacity assessment, the lack of medical treatment between

June 1996 and June 2001, and the lack of pain medications. (R. 23).

Substantial evidence supports the ALJ's conclusion that Oleszko's claimed nonexertional

limitations did not significantly impact his ability to perform the full range of light work. The record

contains no evidence other than Oleszko's testimony that his alleged pain and hand restrictions

significantly affected his capacity to perform the lifting, walking, standing, and pushing and pulling

requirements of light work. As noted above, the ALJ properly discounted Oleszko's subjective

complaints of pain based upon the medical evidence, lack of significant treatment, and lack of pain

medications. The ALJ's credibility determination was not patently wrong. Moreover, Oleszko's

physician and therapists indicated that he had grip strength that allowed lifting and carrying 30 to 35

pounds, and no limits were placed on his gross hand functioning. (R. 156, 184-85, 365). Oleszko's

right wrist fracture healed properly and there is no medical evidence indicating that Oleszko

sustained any significant loss of use with respect to his right hand. (R. 246). No physician placed

limits on Oleszko's gross hand functioning. Furthermore, none of Oleszko's treating or examining

physicians indicated that he was limited in his ability to sit. Finally, Stanley Burris, M.D., found in

the residual functional capacity assessment that Oleszko could stand and/or walk about 6 hours in

an 8-hour workday, sit about 6 hours in an 8-hour workday, and found no manipulative limitations.

(R. 257, 259).[12] Because substantial evidence supports the ALJ's determination that Oleszko did not suffer significant nonexertional impairments, the ALJ's use of the grids was appropriate.

4.    Borderline Age Analysis

One final issue remains. Oleszko argues that the ALJ erred by classifying him as a "person closely approaching advanced age" and by failing to place him in a higher age category as may be appropriate in borderline age situations. Oleszko was born on January 23, 1947 (R. 484). A person age 18 to 49 is classified in the "younger person" age category. 20 C.F.R. § 404.1563(a). A person age 50 to 54 is classified in the category of "closely approaching advanced age." 20 C.F.R. § 404.1563(d). The ALJ stated that Oleszko was 54 years old (in fact he had turned 55 years old two days prior to the ALJ's issuance of his decision) and was therefore considered a person closely approaching advanced age. The ALJ did not consider whether a borderline age situation existed.

As noted above, the ALJ's reliance on the grids in making his findings is supported by substantial evidence. Whether Oleszko's situation of more than six months but less than seven months from his 55th birthday on June 30, 2001 (the date his insured status expired) qualifies as a borderline situation is not expressly decided by the regulations. See SSR 83-10 (stating "[u]nder title II, a period of disability cannot begin after a worker's disability insured status has expired. When the person last met the insured status requirement before the date of adjudication, the oldest age to be considered is the person's age at the date last insured. In these situations, the person's age at the time of decisionmaking is immaterial."). The regulations refer to a claimant being 'within a few days

---

[12] Also, light work requires standing or walking for most of the workday, and therefore, a limitation against prolonged sitting would not substantially reduce the range of light work Oleszko can perform. See SSR 83-14 (explaining that "[t]he major difference between sedentary and light work is that most light jobs–particularly those at the unskilled level of complexity–require a person to be standing or walking most of the workday.").

-22-

to a few months' of the older age category, but the cases tend to treat claimants who are within six months of [the higher age category] as presenting borderline cases." Smith v. Barnhart, 2002 WL 126107 at *3 (N.D. Ill. Jan. 31, 2002)(citing cases); see also 20 C.F.R. § 404.1563(b) (emphasis added) and Pickard v. Commissioner of Social Security, 224 F.Supp.2d 1161, 1167 (W.D. Tenn. 2002) (noting that courts have generally "conclud[ed] that the borderline range falls somewhere around six months from the older age category."). The Court declines to find that a more than sixth months gap requires a borderline age analysis by the ALJ.

## CONCLUSION

For these reasons, the ALJ's decision denying Oleszko's application for benefits is affirmed. Oleszko's motion for summary judgment [19-1] is denied, and the Commissioner's motion for summary judgment [21-1] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff pursuant to Federal Rule of Civil Procedure 58.

**E N T E R:**

Nan R. Nolan
**United States Magistrate Judge**

**Dated: February 6, 2006**

-23-